F1LED

2004 AUG 19 P 1: 49

CLERK US DIST COURT
EASTERN DIST. OF CALIF

BY_____
          DEPUTY

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL WAYNE GOLDEN, JACOB GOLDEN, JESSICA GOLDEN & HEIDI MILLER | CIV-F-00-7173 OWW SMS |
| | ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT FOR DEFENDANT SHERIFF PIERCE |
| Plaintiffs, | |
| v. | |
| COUNTY OF FRESNO; et al., | |
| Defendants. | |

Plaintiffs[1] have sued the County of Fresno and a number of Fresno County Sheriff's Department deputies under 42 U.S.C. §1983.  Defendants in this case[2] move for summary judgment in favor of defendant Sheriff Richard Pierce, in both his individual

---

[1] The plaintiffs (collectively "Plaintiffs") are Michael Golden, Jacob Golden, Jessica Golden, and Heidi Miller.  Jacob and Jessica Golden are Michael Golden's children.

[2] The current defendants (collectively "Defendants") are the County of Fresno ("Fresno County"); Sheriff Richard Pierce ("Sheriff Pierce"); Lieutenant Robert Hagler, Jr. ("Lt. Hagler"); Deputy Richard Ko ("Dep. Ko"); Deputy Bret McAndrews ("Dep. McAndrews"); and Deputy John Avila ("Dep. Avila").  All of these individuals are employees of the Fresno County Sheriff's Department ("FCSD").

1

1  and official capacities. See Doc. 117, Defendants' Motion.

2  Plaintiffs oppose the motion with respect to claims against

3  Sheriff Pierce in his individual capacity. See Doc. 122,

4  Plaintiffs' Opposition.  Plaintiffs initially opposed the

5  dismissal of Sheriff Pierce in his official capacity in its

6  Opposition. Doc. 122, Plaintiffs' Opposition, at 4:2-10.  At the

7  first oral argument hearing on Feb. 9, 2004, Plaintiffs' counsel,

8  M. Jeffrey Kallis stated Plaintiffs' non-opposition to dismissal

9  of Sheriff Pierce in his official capacity.

10

11                      I.  Background

12      On December 29, 1999, plaintiff Michael Golden, together

13  with his children Jacob and Jessica Golden, traveled to the

14  Fresno County Sheriff's Department ("FCSD") to turn in two

15  automatic rifles pursuant to a voucher program. Doc. 83, Third

16  Amended Complaint, ¶6.  While at the FCSD, the Goldens allege

17  they were assaulted, detained without cause, and interrogated by

18  Dep. Ko in connection with an ongoing investigation into the

19  theft of explosive devices. Doc. 83, Third Amended Complaint, ¶6.

20  During the questioning, Michael Golden denied any knowledge of

21  the explosives. Doc. 83, Third Amended Complaint, ¶6.  Michael,

22  Jacob, and Jessica Golden left the Sheriff's Office at

23  approximately 5 PM after being there about one hour. Doc. 83,

24  Third Amended Complaint, ¶6.

25      The FCSD had received a tip from the Crime Stoppers hotline

26  that Michael Golden may have been involved in the theft of

27  explosives.  The tip was from Michael Golden's ex-wife, Leslie

28  Nunez, who was involved in a custody and child support dispute

                              2

with Michael Golden. Doc. 122, Plaintiffs' Opposition, at 4:24-5:2.  Dep. Ko was aware of Leslie Nunez's potential bias against Michael Golden.  Based on the information provided, Dep. Ko went before a judge and procured a search warrant without revealing the informant's relation to Michael Golden. Doc. 122, Ex. 6, Dep. Ko Deposition, at 98:2-12 and Ex. 8, Dep. Ko Deposition, at 113:17-9.

Plaintiffs allege that while driving home, Michael Golden became suspicious that they were being followed and pulled over to the side of the road. Doc. 83, Third Amended Complaint, ¶7. FCSD deputies, including defendants Dep. Avila, Lt. Hagler, and Dep. McAndrews, then jumped out of an unmarked car wearing ski masks and surrounded plaintiffs' car. Doc. 83, Third Amended Complaint, ¶7.  These defendants physically removed Michael Golden from the vehicle at gunpoint, searched him, and placed him in a marked vehicle. Doc. 83, Third Amended Complaint, ¶7. Plaintiffs contend that these deputies traumatized Jacob and Jessica Golden by pointing loaded guns at them, shouting and screaming, and separating them from their father. Doc. 83, Third Amended Complaint, ¶7.  Plaintiffs allege that throughout the ordeal, defendants did not identify themselves as law enforcement officers and therefore Michael, Jacob, and Jessica Golden believed they were being kidnaped by highwaymen. Doc. 83, Third Amended Complaint, ¶8.

The Goldens were transported to their residence at approximately 6 PM. Doc. 83, Third Amended Complaint, ¶9. Plaintiffs allege that the front door to their home had been battered open and their house ransacked by defendants who

3

1  conducted a search pursuant to a search warrant. Doc. 83, Third
2  Amended Complaint, ¶9-10.  Plaintiffs allege that Michael Golden
3  requested FCSD deputies show him a search warrant, but Lt. Hagler
4  refused his request. Doc. 83, Third Amended Complaint, ¶11.
5  Plaintiffs contend that Michael Golden was not informed of his
6  Miranda rights, was unlawfully interrogated about the explosives
7  theft, and was denied permission to consult with his attorney.
8  Doc. 83, Third Amended Complaint, ¶12.

9      At approximately 7 PM, Heidi Miller arrived at the
10  residence. Doc. 83, Third Amended Complaint, ¶13.  According to
11  Plaintiffs, FCSD deputies stopped her and demanded to see her
12  driver's license while she was driving in front of the Golden
13  residence.  Plaintiffs allege the deputies moved their car after
14  Heidi Miller showed her license so that she could drive onto
15  Michael Golden's property thereby "entrapping her into the
16  unlawful scenario." Doc. 83, Third Amended Complaint, ¶13.
17  Plaintiffs also allege Heidi Miller's car was unlawfully
18  searched, she was forced to enter the Golden residence, and she
19  was prevented from consulting with her attorney. Doc. 83, Third
20  Amended Complaint, ¶13-14.  Michael Golden and Heidi Miller were
21  allegedly denied access to Jessica Golden's heart medication.
22  Doc. 83, Third Amended Complaint, ¶14.

23      Michael Golden's attorney arrived at approximately 9 PM.
24  Doc. 83, Third Amended Complaint, ¶15.  Plaintiffs claim that the
25  attorney was denied access to the residence and was threatened
26  with arrest if he did not stop taking photographs. Doc. 83, Third
27  Amended Complaint, ¶15.  At approximately 10 PM, Lt. Hagler
28  showed Plaintiffs a copy of the search warrant.  Shortly after,

1   Plaintiffs were given a receipt stating nothing was found or
2   removed. Doc. 83, Third Amended Complaint, ¶15.

3        Michael Golden is a radio talk show host who has often
4   criticized Fresno public officials on the air.  He claims to have
5   called into another radio talk show called "The Radio Detective"
6   ("Radio Show") in late 1999, on which Sheriff Pierce was a guest
7   speaker along with the District Attorney of Fresno County, Edward
8   Hunt("DA Hunt").  During this show, Michael Golden criticized
9   Sheriff Pierce and DA Hunt for the arrest of individuals involved
10  in a supposed pyramid scheme.  Michael Golden contended on air
11  that the arrests were political persecution for opposition to law
12  enforcement authorities.  Plaintiffs state that Sheriff Pierce
13  and DA Hunt became enraged by the criticism and implicitly
14  threatened Michael Golden on the air. Doc. 83, Third Amended
15  Complaint, ¶17.

16       Plaintiffs allege certain defendants (Dep. Avila, Lt.
17  Hagler, Dep. McAndrews, Dep. Ko, and a number of City of Fresno
18  police officers[3]) intentionally, wantonly, and unnecessarily
19  destroyed plaintiffs' property. Doc. 83, Third Amended Complaint,
20  ¶16.  Plaintiffs assert that Defendants stole property including,
21  a collection of gold and silver coins valued at $30,000 to
22  $40,000. Doc. 83, Third Amended Complaint, ¶16.  No illegal
23  firearms or explosives were found at the residence. Doc. 83,
24  Third Amended Complaint, ¶16.  Plaintiffs also allege that
25  Defendants' conduct was directed by Sheriff Pierce in retaliation
26
27  _____
        [3] These officers were named defendants, who have been
28  dismissed with prejudice.

5

1  for Michael Golden's public criticism. Doc. 83, Third Amended

2  Complaint, ¶17.  After the fact, Sheriff Pierce did not

3  discipline the deputies under his command who were involved. Doc.

4  83, Third Amended Complaint, ¶19.

5       On December 26, 2000 Plaintiffs filed suit[4].  On January 1,

6  2001, Plaintiffs filed their first amended complaint.  Defendants

7  filed motions to dismiss the first amended complaint for failure

8  to state a claim.  On July 13, 2001 the motion to dismiss the

9  bureau of Alcohol, Tobacco, and Firearms was granted with

10 prejudice; all other motions to dismiss were granted with leave

11 to amend.  On August 31, 2001, plaintiffs filed a second amended

12 complaint.

13      On September 7, 2001 the county defendants and city

14 defendants[5] filed motions to dismiss for failure to state a claim

15 or in the alternative a motion for a more definite statement.  On

16 September 14, 2001, defendant Special Agent Mayfield filed a

17 motion to dismiss.  The county defendants' motion was denied as

18 to Jacob and Jessica Golden's standing to sue and the

19 insufficiency of the Monell claim.  The county defendants' motion

20

21  _____

22      [4] The original lawsuit named as defendants (in addition to
    all current Defendants) the City of Fresno; City Police Chief
23  Edward Winchester; the Bureau of Alcohol, Tobacco, and Firearms;
    and Special Agent Gary Mayfield.  The third amended complaint
24  added Lieutenant Hall, Officer Chastain, and Officer Brisendine
    as defendants.  All of these other defendants have been dismissed
25  with prejudice.

26      [5] The county defendants are the current Defendants, who are
27  all associated with the County of Fresno.  The city defendants
    are the City of Fresno, Police Chief Winchester and city police
28  officers.

1  to dismiss was granted as to the conspiracy allegations and Ms.
2  Miller's standing to bring suit for alleged unlawful search of
3  the Golden residence.   The city defendants' motion to dismiss was
4  denied as to the theft claim.   City defendants' motion to dismiss
5  was granted as to the claim the search warrant was fraudulently
6  obtained and the destruction of property allegation.   Special
7  Agent Mayfield's motion to dismiss based on the insufficiency of
8  service was denied.   His motion was granted as to the conspiracy
9  allegation, the assault allegation, the destruction of property
10  allegation, and Ms. Miller's claims.   The county defendants'
11  motion for a more definite statement was granted.   Special Agent
12  Mayfield's motion to dismiss was granted with prejudice as to the
13  claim he procured a search warrant under false pretenses.   All of
14  the other claims that were dismissed for failure to state a claim
15  were dismissed without prejudice.

16      On December 19, 2001, plaintiffs filed a third amended
17  complaint, the currently operative complaint.   Doc. 83, Third
18  Amended Complaint.   On December 31, 2001, the county defendants
19  moved to dismiss the complaint for failure to state a claim or in
20  the alternative for a more definite statement.   On January 15,
21  2002, Special Agent Mayfield was dismissed with prejudice.   On
22  February 6, 2002, the city defendants moved for summary judgment
23  on the theft claim.   The motion was granted April 15, 2002 with
24  prejudice.   The pending summary judgment motion, filed Dec. 30,
25  2003, seeks to dismiss Sheriff Pierce in both his individual and
26  official capacities. See Doc. 117, Defendants' Motion.
27  Plaintiffs opposed the motion in their initial response. See Doc.
28  122, Plaintiffs' Opposition.   At the first oral argument hearing

7

on Feb. 9, 2004, Plaintiffs' counsel stated that Plaintiffs would not oppose dismissal of Sheriff Pierce in his official capacity. A second oral argument hearing was held February 23, 2004.

## II.   Statement of Undisputed Material Fact

7.   As a general rule when deputies serve search warrants, it is the practice and policy of the Fresno Sheriff's Department to consider the tactics employed on a case by case basis.   This includes consideration of whether undercover deputies will wear hoods covering their faces, when necessary for safety of the officers.   Such consideration is made prior to the service of a warrant.   It is also the practice and policy of the Fresno Sheriff's Department for deputies to wear clothing that identifies them as peace officers when serving search warrants.

8.   Crime Stoppers' hotline received a tip regarding the possible involvement of plaintiff Michael Golden in a burglary that took place at a weapons depot near Auberry.

10.   The operational plan for the service of the search warrant for the residence of plaintiff Michael Golden was created by Lieutenant (then Sergeant) Richard Hill on December 29, 1999 between 5:00 and 6:00 PM.

12.   Prior to December 29, 1999 Lieutenant Richard Hill had never heard of plaintiff Michael Golden.

Disputed material facts:

1.   Defendant Pierce does not recall knowing who Michael Golden is before the instant lawsuit was filed.

1    2.  Defendant Pierce does not recall plaintiff Michael

2 Golden, or any other person, calling into the radio show known as

3 "the Radio Detective" when defendant Pierce was a guest on the

4 show.

5    3.  Defendant Pierce was not aware that plaintiff Michael

6 Golden made comments critical to him on Golden's radio show until

7 this lawsuit was brought to his attention.

8    4.  Defendant Pierce was not the supervisor in charge of any

9 operations, described in the Third Amended Complaint, against any

10 of the plaintiffs in this action.

11    5.  Defendant Pierce did not direct the actions of any of

12 the peace officers referred to in the Third Amended Complaint.

13    6.  Defendant Pierce had no knowledge of the incidents

14 giving rise to Plaintiff's complaint until after the date of the

15 incidents.

16    11.  The search warrant operations at the Golden residence

17 on December 29, 2003, were carried out under the supervision of

18 Lt. Richard Hill.

19

20             III.   Legal Standards

21    Summary judgment is appropriate only "if the pleadings,

22 depositions, answers to interrogatories, and admissions on file,

23 together with the affidavits, if any, show that there is no

24 genuine issue as to any material fact."  FED. R. CIV. P. 56(c);

25 see also Maffei v. Northern Ins. Co. of New York, 12 F.3d 892,

26 899 (9th Cir. 1993).  A genuine issue of fact exists when the

27 non-moving party produces evidence on which a reasonable trier of

28 fact could find in its favor viewing the record as a whole in

1  light of the evidentiary burden the law places on that party.

2  *See Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th

3  Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S.

4  242, 252-56 (1986).   The non-moving party cannot simply rest on

5  its allegation without any significant probative evidence tending

6  to support the complaint.   *See U.A. Local 343 v. Nor-Cal*

7  *Plumbing, Inc.*, 48 F.3d 1465, 1471 (9th Cir. 1995).

8       [T]he plain language of Rule 56(c) mandates the entry
        of summary judgment, after adequate time for discovery
9       and upon motion, against a party who fails to make a
        showing sufficient to establish the existence of an
10      element essential to the party's case, and on which
        that party will bear the burden of proof at trial.   In
11      such a situation, there can be "no genuine issue as to
        any material fact," since a complete failure of proof
12      concerning an essential element of the non-moving
        party's case necessarily renders all other facts
13      immaterial.

14  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986).

15       The more implausible the claim or defense asserted by the

16  opposing party, the more persuasive its evidence must be to avoid

17  summary judgment.   *See United States ex rel. Anderson v. Northern*

18  *Telecom, Inc.,* 52 F.3d 810, 815 (9th Cir. 1996).   Nevertheless,

19  "[t]he evidence of the non-movant is to be believed, and all

20  justifiable inferences are to be drawn in its favor."   *Liberty*

21  *Lobby,* 477 U.S. at 255.   A court's role on summary judgment,

22  however, is not to weigh the evidence, *i.e.,* issue resolution,

23  but rather to find genuine factual issues.   *See Abdul-Jabbar v.*

24  *General Motors Corp.,* 85 F.3d 407, 410 (9th Cir. 1996).

25       Evidence submitted in support of or in opposition to a

26  motion for summary judgment must be admissible under the standard

27  articulated in 56(e). *See Keenan v. Hall,* 83 F.3d 1083, 1090 n.1

28  (9th Cir. 1996); *Anheuser-Busch, Inc. v. Nat'l Beverage*

1    *Distribs.*, 69 F.3d 337, 345 n.4 (9th Cir. 1995).  Properly

2    authenticated documents, including discovery documents, although

3    such documents are not admissible in that form at trial, can be

4    used in a motion for summary judgment if appropriately

5    authenticated by affidavit or declaration.  *See United States v.*

6    *One Parcel of Real Property*, 904 F.2d 487, 491-492 (9th Cir.

7    1990).  Supporting and opposing affidavits must be made on

8    personal knowledge, shall set forth such facts as would be

9    admissible in evidence, and shall show affirmatively that the

10    affiant is competent to testify to the matters stated therein.

11    *See* FED. R. CIV. P. 56(e); *Connor v. Sakai*, 15 F.3d 1463, 1470

12    (9th Cir. 1993), *rev'd on other grounds sub nom. Sandin v.*

13    *Connor*, 515 U.S. 472 (1995).

14

15                    IV.  <u>Discussion</u>

16       Plaintiffs' 42 U.S.C. §1983 cause of action raises two main

17    claims: 1) "Michael [Golden] was deprived of his First Amendment

18    right to speak out in a critical manner concerning public

19    officials without fear of reprisal and retribution and 2)

20    "plaintiffs were deprived of their Fourth and Fourteenth

21    Amendment Right to be secure in their persons, houses, papers and

22    effects...to be free from false arrest, unreasonable search and

23    seizure, and excessive and unnecessary force...to be free from

24    the issuance of warrant to search [Golden] residence in bad faith

25    and without probable cause, and to be free from the unreasonable

26    and unnecessary destruction and theft of property."  Doc. 83,

27    Third Amended Complaint, at 7:15-22.  As Plaintiffs have stated

28    their non-opposition to dismissal of Sheriff Pierce in his

1 official capacity, all claims are evaluated against Sheriff
2 Pierce in his individual capacity only.

3

4     A.   Michael Golden's First Amendment Claim

5          Plaintiffs claim that the Dec. 29, 1999 events were a form
6 of personal retaliation, executed through use of law enforcement
7 resources to address Michael Golden's criticisms of Fresno County
8 law enforcement aired on the Radio Show.  This retaliation
9 allegedly violated Michael Golden's First Amendment rights to
10 free speech by chilling his freedom to criticize public
11 officials. Doc. 83, Third Amended Complaint, at 7:20-23.
12 Plaintiffs assert that Sheriff Pierce authorized or otherwise
13 knew about but did not stop the events of Dec. 29, 1999.
14 Plaintiffs also claim that Sheriff Pierce is personally
15 responsible for the Dec. 29, 1999 events, regardless of whether
16 he had any personal involvement due to the fact that he is
17 ultimately responsible for all actions of the FCSD, as the head
18 of the Sheriff's Department. See Doc. 122, Plaintiffs'
19 Opposition, at 7:12-16.

20          To demonstrate a First Amendment violation, Plaintiffs must
21 show that Sheriff Pierce attempted to deter or chill Michael
22 Golden's speech and such deterrence was a substantial or
23 motivating factor in Sheriff Pierce's conduct. *Mendocino Envtl.*
24 *Ctr. v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir. 1999).
25 Circumstantial evidence can be sufficient to defeat summary
26 judgment in this context.  See *Mendocino Envtl. Ctr. v. Mendocino*
27 *County*, 192 F.3d 1283, 1301 (9th Cir. 1999); Keyser v. Sacramento
28 City Unified School District, 265 741, 751-2 (9th Cir. 2001).

1              1.   <u>Retaliatory Motive</u>

2        Plaintiffs contend that the events of Dec. 29, 1999 were

3   motivated by Sheriff Pierce's desire to retaliate against Michael

4   Golden for his critical comments on the Radio Show.   Plaintiffs

5   have provided the depositions of Michael Golden and Richard

6   Cabral to support the claim.   Michael Golden describes the on-air

7   conversation.   After calling in to criticize the FCSD and the

8   district attorney's office, Michael Golden allegedly became

9   embroiled in a tense conversation with Sheriff Pierce and DA

10  Hunt.   Michael Golden specifically criticized the arrest of a

11  number of his friends termed "The Fresno Four" who were involved

12  in what the police thought was an illegal pyramid scheme.

13  Michael Golden claims that DA Hunt said "they were going to take

14  these people down, and [Michael Golden] was the next to be taken

15  down and taken out" and that "if [Michael Golden] was dealing

16  with these people, they were going to be able to find something

17  with [him] too. [He] was the next target on their list." Doc.

18  122, Ex. 2, Michael Golden Declaration, at 15:9-20.   He did not

19  recall if Sheriff Pierce made any threats. Doc. 122, Ex. 2,

20  Michael Golden Declaration, at 16:6-8.

21       Richard Cabral was a participant on the Radio Show during

22  the last two months of 1999. Doc. 129, Richard Cabral

23  Declaration, at 2:7-8.   He recalls that Michael Golden called in

24  when Sheriff Pierce and DA Hunt were guests on the show.   He

25  states that they discussed the arrest of individuals connected to

26  an alleged pyramid scheme and that Michael Golden criticized both

27  Sheriff Pierce and DA Hunt. Doc. 129, Richard Cabral Declaration,

28  at 2:11-16.   Sheriff Pierce and DA Hunt became upset and made

1  "implicit and explicit threats against [Michael] Golden";

2  "Sheriff Pierce strongly implied that [Michael] Golden should

3  watch out for himself rather than worry about the four people who

4  had been arrested." Doc. 129, Richard Cabral Declaration, at

5  2:17-20.  It is unclear whether Richard Cabral was physically in

6  the studio where the Radio Detective was taped/broadcast and had

7  opportunity to observe Sheriff Pierce's reactions in person.

8       Defendants have provided the declaration and deposition of

9  Sheriff Pierce to support their assertion that no retaliation of

10 any kind was contemplated or carried out.  Sheriff Pierce admits

11 that he and DA Hunt were guests on the Radio Show on more than

12 one occasion. See Doc. 121, Ex. E, Sheriff Pierce Declaration, at

13 32:7-19.  He claims he does not recall any specific individual

14 who called the show. See Doc. 121, Ex. E, Sheriff Pierce

15 Declaration, at 32:20-25 and 33:8-10.  Defendants have not

16 disputed Michael Golden's characterization of the exchange on the

17 Radio Show.  Since Sheriff Pierce does not have any specific

18 recollection of his appearance on the Radio Show, he has not

19 challenged Michael Golden's account.

20      Defendants object to the declaration of Richard Cabral

21 citing the unreliability of the testimony after the passage of 5

22 years time. Doc. 132, Plaintiffs' Supplemental Reply, at 2:17-20.

23 This raises an issue of credibility, normally left to the fact

24 finder.  In a motion for summary judgment, all reasonable

25 inferences are to be drawn in favor of the non-moving party.

26      Plaintiffs' evidence, although marginal, is sufficient to

27 raise question whether Sheriff Pierce was motivated to retaliate

28 against Michael Golden for his critical comments on the Radio

14

Show and past criticism of Fresno County law enforcement and in turn ordered the search.  Plaintiffs still must show a triable issue of whether Michael Golden was actually retaliated against in order to establish a violation of First Amendment rights.  To prove a case of retaliation, Plaintiffs must prove some "nexus between the exercise of *First Amendment* rights and [the retaliation]". *Karam v. City of Burbank*, No. 02-55954, 2003 U.S. App. LEXIS 24627 at *13 (9th Cir. Oct. 15, 2003); i.e. that the criticisms aired caused retaliation.  Defendants argue that regardless of any altercation Michael Golden and Sheriff Pierce had on the Radio Show, Sheriff Pierce did not in fact retaliate against Michael Golden in any way.

## 2.   Sheriff Pierce's Connection to Dec. 29, 1999 Events

First, Sheriff Pierce stated that "[t]o the best of his knowledge", he has never told anyone to investigate Michael Golden. Doc. 128, Ex. 4, Sheriff Pierce Declaration, at 41:20-22. Plaintiffs allege that there was an active investigation of Michael Golden directed by Sheriff Pierce. Doc. 122, Plaintiffs' Opposition, at 4:21-23.  Plaintiffs have stated that Sheriff Pierce is "clearly tied to continuing investigation of Mr. Golden, by the testimony of his own Lt., Scott Jones." Doc. 122, Plaintiffs' Opposition, at 4:4-5.  Lt. Jones's testimony confirms that there was an investigation of Michael Golden that took place after Dec. 29, 1999 although Lt. Jones denies it was directed from a higher authority. Doc. 122, Ex. 17, Lt. Jones Declaration, at 122:14-24 and 136:14-137:12.  Plaintiffs in four years have

1 | not produced any evidence that any investigation of Michael
2 | Golden was undertaken by the FCSD before Dec. 29, 1999.
3 | Plaintiffs have submitted no evidence that Sheriff Pierce talked
4 | to anyone at the FCSD about Michael Golden before Dec. 29, 1999.

5 |     A review of the cited portion of Scott Jones's deposition
6 | does not reveal that Sheriff Pierce ordered, initiated, or
7 | supervised the investigation of Michael Golden after Dec. 29,
8 | 1999.  Lt. Jones testified the only time he and Sheriff Pierce
9 | discussed Michael Golden was in relation to the present lawsuit.
10 | See Doc. 122, Ex. 17, Lt. Jones Deposition, at 124:16-125:7.  Lt.
11 | Jones did not state or imply that Sheriff Pierce directed or had
12 | any personal involvement in the Golden investigation.  From Lt.
13 | Jones's deposition, it is unclear exactly what sort of directions
14 | senior officials in the FCSD gave to investigators regarding the
15 | ongoing investigation of Michael Golden: "[Question] Did, to your
16 | knowledge, the executive staff give instructions to anyone or
17 | were you told that the executive staff gave instructions for
18 | there to be any investigation or continued investigation of Mr.
19 | Golden?  [Answer] I would have been told, I don't know if it
20 | would have been Lieutenant Hagler or Captain Gattie, I don't
21 | recall exactly but given evidence to say - or information, facts,
22 | saying we have information to believe crimes are occurring- and
23 | then we would have been given, yes - continue the investigation
24 | on criminal activity." Doc. 122, Ex. 17, Lt. Jones Deposition, at
25 | 136:13-137:2.  This is consistent with Lt. Jones's testimony that
26 | investigators developed information that lead them to believe
27 | Michael Golden was involved in criminal activity and presented it
28 | to senior FCSD officials, who in turn approved continuing the

16

investigation. See Doc. 122, Ex. 17, Lt. Jones Deposition, at
136:4-7 ("I am command staff officer so my direct supervisor
would have been Lieutenant Hagler. If I present him with facts
and circumstances that indicate illegal behavior, then he would
have said continue.").

Capt. Gattie, who is in charge of investigations, forwarded
Lt. Jones e-mails sent to Sheriff Pierce by individuals who wrote
in to complain about the Dec. 29, 1999 events. Doc. 122, Ex. 17,
Lt. Jones Deposition, at 122:20-24.  Even taking all inferences
in favor of Plaintiffs, nothing can be established from this act
aside from the fact that Capt. Gattie reported directly to
Sheriff Pierce. Doc. 122, Ex. 17, Lt. Jones Deposition, at 133:7-
11.  There is no evidence provided that Sheriff Pierce gave or
needed to give specific instructions to Capt. Gattie to initiate
or continue the investigation.  Plaintiffs have asserted that
Capt. Gattie "instituted and promoted investigations of [Michael]
Golden even after the search showed no wrongdoing." Doc. 122,
Plaintiffs' Opposition, at 9:25-26.  If true, such a fact could
support a claim against Capt. Gattie, but not Sheriff Pierce.
There is only a scintilla of evidence from which to infer that
Sheriff Pierce had knowledge of or acquiesced in the Golden
investigation.  Sheriff Pierce did not recall the e-mails he
received and then provided Capt. Gattie, which complained about
the Dec. 29, 1999 incident. See Doc. 121, Ex. F, Sheriff Pierce
Deposition, at 35:7-25 (Capt. Gattie did not have regular access
to Sheriff Pierce's e-mail).

Plaintiffs allege that Sheriff Pierce is personally liable
since he has failed to monitor or discipline the individuals

17

1   involved in the events of Dec. 29, 1999.  A failure to
2   investigate complaints of officer misconduct or failure to follow
3   up with Capt. Gattie could be the basis for an inference of
4   deliberate indifference if there is additional evidence of a
5   custom, pattern, or practice.  The failure to discipline assumes
6   wrongdoing, which would require discipline, a fact very much in
7   dispute.

8        Plaintiffs' allegations relative to Sheriff Pierce are
9   unclear as to the actual events of Dec. 29, 1999.  Plaintiffs'
10  evidence does not show anything specific that Sheriff Pierce did
11  on that day.  They allege that Sheriff Pierce directly or
12  indirectly instigated actions on that day which might include
13  Dep. Ko's interview of Michael Golden at the FCSD building
14  regarding the explosives theft, procurement of the warrant to
15  search his house, and the actual means of executing that warrant.

16       Sheriff Pierce has affirmatively testified that he did not
17  direct any of the events of Dec. 29, 1999. Doc. 120, Sheriff
18  Pierce Declaration, at 1:27-2:3.  There is no suggestion that
19  Sheriff Pierce had any personal knowledge of or participation in
20  the events of Dec. 29, 1999.  From the record provided, there is
21  no evidence beyond speculation that Sheriff Pierce knew about any
22  of the events of that day until the day of Dec. 29, 1999.  Dep.
23  Ko states that he learned of a tip from the Crime Stoppers
24  hotline on the morning of Dec. 29, 1999, suggesting that Michael
25  Golden may have been involved in a theft of explosives. See Doc.
26  121, Ex. D, Dep. Ko Deposition, at 15:16-16:1.  He discussed the
27  tip with Lt. Hagler (Doc. 121, Ex. B, Lt. Hagler Deposition, at
28  13:7-12), which set the events of Dec. 29, 1999 in motion.

1  Defendants also provide Lt. Hill's testimony establishing he
2  created the operation plan for serving the search warrant on
3  Michael Golden's residence. See Doc. 121, Ex. C, Lt. Hill
4  Deposition, at 13:12-17.  Plaintiffs have not shown that any of
5  these individuals spoke to or communicated with Sheriff Pierce
6  before they interviewed Michael Golden, obtained the search
7  warrant, and executed that warrant.

8      Plaintiffs have not provided any direct evidence that
9  suggests Sheriff Pierce was personally involved in the events of
10  Dec. 29, 1999 in any way.  They rely on Sheriff Pierce's
11  deposition statement that he is "responsible for the entire
12  department".  Doc. 122, Ex. 1, Sheriff Pierce Deposition, at
13  20:17.  "Under Section 1983, supervisory officials are not liable
14  for actions of subordinates on any theory of vicarious
15  liability." *Hansen v. Black*, 885 F.2d 642, 645-6 (9th Cir. 1989).

16      The evidence is all but nonexistent that Sheriff Pierce had
17  any role in the events of Dec. 29, 1999.  No staff officer has
18  confirmed that he had any role in those events.  Nevertheless,
19  viewing the evidence most favorably to Plaintiffs, there is an
20  issue as to what "retaliatory" role Sheriff Pierce may have
21  played in these events.  Borrowing from the field of retaliatory
22  termination, "proximity in time between the protected action and
23  the allegedly retaliatory employment decision was one in which a
24  jury logically could infer that the plaintiff was terminated in
25  retaliation for his speech." *Keyser v. Sacramento City Unified*
26  *School District*, 265 F.3d 741, 751 (9th Cir. 2001).  Here,
27  Plaintiff's evidence shows Sheriff Pierce was publically
28  criticized by Michael Golden; the search warrant followed; and

1  despite e-mail complaint, Sheriff Pierce did not follow up on
2  confirming the results of the search or conduct a review of the
3  conduct of the responsible deputies.  On Dec. 29, 1999, the
4  FCSD's search and related activities could be interpreted as to
5  chill Michael Golden's criticism of the FCSD, including the
6  manner in which the original search warrant was obtained.
7  Sheriff Pierce has no memory of any involvement.  The assigned
8  officers or deputies at most say that Sheriff Pierce may have
9  received a report, but not that he personally participated in any
10 of the strategy or decision making.  That he may have had a
11 motive or alleged bias against Michael Golden without more does
12 not constitute the active personal knowledge and participation
13 the law requires.  The only possible theory is that he failed to
14 investigate when provided notice after the fact and then ratified
15 the allegedly wrongful course of conduct.  Plaintiffs barely
16 survive this motion based on the totality of circumstances.  As
17 to Sheriff Pierce, individually, the motion is DENIED.

19          B.   Plaintiffs' Fourth and Fourteenth Amendment Claims

20          In addition to the First Amendment issue, Plaintiffs claim
21 that Sheriff Pierce has personal liability for the Dec. 29, 1999
22 events regardless of whether he had any personal involvement due
23 to the fact that he is ultimately responsible for all actions of
24 the FCSD as the head of the Sheriff's Department. See Doc. 122,
25 Plaintiffs' Opposition, at 7:12-16.  Plaintiffs assert the
26 actions of Dec. 29, 1999 violated their Fourth and Fourteenth
27 Amendment rights, including violations of due process,
28 unreasonable search and seizure, and excessive force. Doc. 83,

Third Amended Complaint, at 7:15-20.  Failure to properly train deputies of the FCSD may open Sheriff Pierce to liability under Section 1983 if the inadequate training was systematic and directly caused commissions of constitutional violations.

### 1.   Scope of Supervisor Liability

The fact that Sheriff Pierce is head of the FCSD does not automatically make him vicariously liable for any illegal acts committed by individuals under his command.  "Under Section 1983, supervisory officials are not liable for actions of subordinates on any theory of vicarious liability." *Hansen v. Black*, 885 F.2d 642, 645-6 (9th Cir. 1989) (emphasis added).  "Liability under section 1983 arises only upon a showing of personal participation by the defendant. *Fayle v. Stapley*, 607 F.2d 858, 862 (9th Cir. 1979). A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  The fact that Sheriff Pierce is ultimately in charge of the FCSD does not make him personally liable; Plaintiffs must show evidence of some form of personal involvement, be it authorization or a failure to prevent illegal actions with advance knowledge.  Personal participation has already been addressed above as part of the First Amendment retaliation claim.

With respect to promulgation of policies, "[s]upervisory liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy 'itself is a repudiation of

21

1  constitutional rights' and is 'the moving force of the
2  constitutional violation.'" *Hansen v. Black*, 885 F.2d 642, 646
3  (9th Cir. 1989) (quoting *Thompkins v. Belt*, 828 F.2d 298, 304
4  (5th Cir. 1987)) (ultimately, "the moving force of the
5  constitutional violation" language is quoted from *Monell*).  The
6  standard of official policy infirm enough to merit individual
7  supervisory liability for promulgation of policies arises out of
8  the standard for municipal liability under *Monell*. See *Redman v.*
9  *County of San Diego*, 942 F.2d 1435, 1447 (9th Cir. 1991).  An
10 individual can only be found liable under 42 U.S.C. §1983 for
11 promulgating a policy that also gives rise to municipal liability
12 under the *Monell* standard.

13

14        2.   <u>Unconstitutional Policy of Inadequate Training</u>
15        Specifically, Plaintiffs contend that Sheriff Pierce is
16 personally liable for overseeing a department that has
17 inadequately trained its deputies and that the inadequate
18 training is the direct cause of Plaintiffs' injuries on Dec. 29,
19 1999. Doc. 122, Plaintiffs' Opposition, at 10:21-22.  Plaintiffs
20 must show their rights were violated by a lack of training that
21 was so deficient that Sheriff Pierce "knows or reasonably should
22 know [it] would cause others to inflict the constitutional
23 injury." *Johnson v. Duffy*, 588 F.2d 740, 744 (9th Cir. 1978).
24 "[T]he inadequacy of police training may serve as the basis of
25 §1983 liability only where the failure to train amounts to
26 deliberate indifference to the rights of persons with whom the
27 police come into contact. This rule is most consistent with our
28 admonition in *Monell*, 436 U.S., at 694, and *Polk County v.*

                              22

1  *Dodson*, 454 U.S. 312, 326 (1981), that a municipality can be
2  liable under §1983 only where its policies are the 'moving force
3  [behind] the constitutional violation.'" *City of Canton, Ohio v.*
4  *Harris*, 489 U.S. 378, 388-9 (1989).  The standard for liability
5  is deliberate indifference to a danger of constitutional injury
6  that was known or reasonably known by the Sheriff.

7       Plaintiffs must establish with evidence that constitutional
8  rights were violated and inadequate training was the direct cause
9  of the violation.  Only if there was a constitutional injury in
10 fact would any form of liability attach for promulgating a
11 policy. *See County of Sacramento v. Lewis*, 523 U.S. 833, 837-8
12 (1998) (no liability where there was no underlying constitutional
13 right violated); *Cooper v. Dupnik*, 924 F.2d 1520, 1528 (9th Cir.
14 1991) ("If the conduct of the individual officers is not a
15 constitutional violation, then the fact that the two law
16 enforcement departments condoned such conduct cannot turn it into
17 one").  Defendants focus on the role Sheriff Pierce had in
18 directing (or not directing) the search events; they do not
19 address whether the actions taken on Dec. 29, 1999 violated
20 Plaintiffs' rights.  In order to determine what areas of FCSD
21 training may have been inadequate, it is necessary to clarify
22 what specific actions of Dec. 29, 1999 allegedly caused
23 constitutional violations.

24

25          3.   Substantive Constitutional Violations

26       The only basis for finding a potential constitutional
27 violation is the manner in which the search warrant was procured
28 by Dep. Ko.  Plaintiffs have provided no evidence to substantiate

1  any other constitutional violations though they allege use of

2  excessive force and conversion of Plaintiffs' property.  With

3  regard to the search warrant, Plaintiffs have provided the

4  partial declarations/depositions of Michael Golden, Leslie Nunez,

5  Dep. Ko, Lt. Hall, Special Agent Mayfield, Lt. Jones, and Lt.

6  Hagler. Doc. 122, Ex.1-17.  Leslie Nunez, Michael Golden's ex-

7  wife was the individual who called in the tip suggesting Michael

8  Golden may have been involved in the theft of explosives.  Dep.

9  Ko admits that he knew Leslie Nunez was bipolar and that she was

10  engaged in a child support dispute with Michael Golden. Doc. 122,

11  Ex. 6, Dep. Ko Deposition, at 98:2-12.  Dep. Ko admits that in

12  the course of seeking a search warrant for Michael Golden's

13  house, he did not advise the judge of Leslie Nunez's condition or

14  background circumstances. Doc. 122, Ex. 8, Dep. Ko Deposition, at

15  113:17-9.  Plaintiffs argue that this failure to present

16  information casting doubt on the reliability of an informant

17  violated their right to be free from an unreasonable search under

18  the Fourth Amendment.

19      Leslie Nunez stated that when Dep. Ko spoke to her on the

20  phone he said that they needed to search the house "[b]ecause if

21  the explosives were there, it would be a danger to people." Doc.

22  122, Ex. 4, Leslie Nunez Deposition, at 80:14-5.  When the search

23  warrant was executed on the Golden residence, the Goldens were

24  kept inside the house.  By comparison, the Fresno Police

25  Department (not the FCSD) policy is to "recommend that citizens

26  and non-essential personnel be removed from the scene" when the

27  presence of any explosive device is suspected. Doc. 122, Ex. 12,

28  Lt. Hall Deposition, at 18:11-20.  Plaintiffs draw the inference

1  that the FCSD did not actually believe the missing explosives
2  (which included grenades) were kept at the Golden residence.
3      Whether or not members of the FCSD did in fact violate
4  Plaintiffs' rights on Dec. 29, 1999 is not addressed by the
5  Defendants in this summary judgment motion.  Plaintiffs have
6  presented some evidence that the procedures used to procure and
7  execute the warrant were unreasonable; specifically, failing to
8  fully disclose to the magistrate the informant's questionable
9  reliability and animosity toward Michael Golden.  Whether FCSD
10  search and seizure training includes the duty to provide all
11  information about the informant to the issuing judge is not
12  clear.  Plaintiffs do not submit evidence of the reasonableness
13  of the historical practices of the FCSD used to obtain the search
14  warrants.  Plaintiffs' showing marginally preserves the issue for
15  a fact finder.

16

17          4.   Sufficiency of the Training

18      Based on the alleged violations, the FCSD training on
19  procuring and serving search warrants is at issue, whether there
20  is "a policy so deficient that the policy 'itself is a
21  repudiation of constitutional rights' and is 'the moving force of
22  the constitutional violation.'" *Hansen v. Black*, 885 F.2d 642,
23  646 (9th Cir. 1989).  If a policy is unconstitutional on its face
24  (for instance, discriminatory laws) a single instance may be
25  sufficient for liability under 42 U.S.C. §1983.  If a policy is
26  not unconstitutional on its face but rather causes constitutional
27  violations in its application, then a single instance is not
28  sufficient for 42 U.S.C. §1983 liability.  *Oklahoma City v.*

1 | *Tuttle*, 471 U.S. 808, 823-4 (1985) ("where the policy relied upon
2 | is not itself unconstitutional, considerably more proof than the
3 | single incident will be necessary in every case to establish both
4 | the requisite fault on the part of the municipality, n7 and the
5 | causal connection between the 'policy' and the constitutional
6 | deprivation").

7 | Plaintiffs' claim is not that the policy or search and
8 | seizure training is unconstitutional (teaches officers
9 | unconstitutional practices) but that the lack of adequate
10 | training works to systematically allow constitutional violations
11 | because deputies are insufficiently trained.  More than a single
12 | incident is necessary as a matter of law to show liability.
13 | There is no Section 1983 liability when the a violation of policy
14 | as opposed to the policy itself is the cause of the
15 | constitutional violation. See *Lewis v. Sacramento County*, 98 F.3d
16 | 434, 447 (9th Cir. 1996) (rev'd on other grounds 523 U.S. 833)
17 | ("Officer Smith violated the sheriff's department's pursuit
18 | policy. This violation further undermines any finding that the
19 | county or the sheriff's department, as opposed to Smith, could be
20 | found to have been deliberately indifferent to or in reckless
21 | disregard of Lewis's safety").  Causation requires that the lack
22 | of training lead directly to the violation.

23 | Plaintiffs contend that evidence shows the number of FCSD
24 | sworn personnel has increased by 10% while the training budget
25 | has remained constant. Doc. 122, Plaintiffs' Opposition, at
26 | 10:18-19.  The basis for the conclusion that the training budget
27 | stayed constant is the deposition of Lt. Blohm of the FCSD
28 | training unit, who testified that when initially planning a

26

budget for training, the FCSD starts out with the figure

allocated for the previous year. See Doc. 122, Ex. 19, Lt. Blohm

Deposition, at 44:16-21.  Plaintiffs have provided no actual

figures.  When asked in deposition on Sept. 23, 1003 if there

were any programs that the FCSD could not offer due to budgetary

constraints, Lt. Blohm said that the FCSD had not been forced to

cut back on training for lack of funds in the past. Doc. 128, Ex.

3, Lt. Blohm Deposition, at 17:6-21.  According to Lt. Blohm, the

FCSD has regularly scheduled training sessions and institutes

additional training on an as-needed basis in accordance with

P.O.S.T. standards.

Assuming a lack of funds, Plaintiffs have no evidence or

expert opinion to show how any alleged shortfall in budget funds

resulted in improper search and seizure training.  They have not

shown by expert opinion that the number of hours of training is

inadequate, nor that the content of training is inadequate.  The

FCSD trains its deputies for a minimum of double the hours the

state requires. Doc. 128, Ex. 3, Lt. Blohm Deposition, at 28:6-7.

Plaintiffs argue that the actions of the Defendants who procured

and executed the warrant did not meet the standards of the

California Peace Officers Source Book ("Source Book") and that

the Source Book standards are binding. Doc. 130, Plaintiffs'

Supplemental Opposition, at 11:13-17.  Plaintiffs do not provide

expert testimony explaining how FCSD actions specifically violate

the Source Book.  Defendants argue that the Source Book is only a

"guide" and not binding authority on peace officer conduct. Doc.

132, Defendants' Supplemental Reply, at 6:15-16.  Lt. Blohm said

that the Source Book was only one of the resources used in

1  training. Doc. 128, Ex. 3, Lt. Blohm Deposition, at 11:13-20.
2  While Plaintiffs may be able to show the actions of Dec. 29, 1999
3  may not have followed one set of training guidelines, such a
4  finding bears on whether the conduct in this incident fell below
5  the applicable standard of care, it is not direct evidence of
6  inadequate training.

7       Plaintiffs fail to specifically identify what kinds of
8  training the involved FCSD deputies had in the period before Dec.
9  29, 1999.  The relevant training in this case would cover search
10 and seizure methods and procedures.  Specialized training is
11 provided at the request of individual unit supervisors. Doc. 128,
12 Ex. 3, Lt. Blohm Deposition, at 19:9-25.   Lt. Blohm did not
13 recall if the units which executed the warrant on the Golden
14 residence had search and seizure training in 1998 or 1999. Doc.
15 128, Ex. 3, Lt. Blohm Deposition, at 20:2-21:7.  Plaintiffs have
16 not presented any additional evidence showing whether these units
17 had any training on that topic.

18      Aside from the budget amount for general training,
19 Plaintiffs have no evidence that training applicable to their
20 claims was inadequate.  Plaintiffs point to the fact that Sheriff
21 Pierce has been named in 37 cases pending before the Eastern
22 District of California.  See Doc. 122, Ex. 23.  In a county of
23 approximately 830,000 persons with one of the highest crime rates
24 in California, this establishes nothing.  Nor does it raise an
25 inference that there was inadequate training.  Lt. Blohm
26 testified that to the best of his knowledge, there have been no
27 "court orders or agreements in litigation that require specific
28 training". Doc. 128, Ex. 3, Lt. Blohm Deposition, at 30:12-15.

1  In order for there to be supervisory liability for Sheriff
2  Pierce, he must have been deliberately indifferent to a danger of
3  constitutional injury arising from inadequate training that he
4  knew or reasonably should have known about.  Plaintiffs have no
5  evidence that Sheriff Pierce knew of any past problems in
6  searches and seizure methods or tactics traceable to a lack of
7  training.  He had no notice that there was a problem with the way
8  the FCSD handled training on the execution of search warrants.

9  The only issue that exists is what knowledge Sheriff Pierce
10  had about the policies and training used by his own department
11  for obtaining search warrants.  When asked about the standards
12  for procuring a search warrant, Sheriff Pierce was not able to
13  state whether FCSD policy was to disclose to the issuing judge
14  information tending to discredit an informant's credibility. Doc.
15  128, Ex. 3, Sheriff Pierce Deposition, at 47:14-52:18.  Sheriff
16  Pierce testified "I expect my officers to obey the law to do the
17  right thing. They have an obligation for any informant for any
18  case to determine the credibility of that informant." Doc. 128,
19  Ex. 3, Sheriff Pierce Deposition, at 51:3-6.  Sheriff Pierce
20  ultimately did not answer whether any adverse information had to
21  be presented to the judge.

22  The record is devoid of evidence about the actual extent of
23  training on search warrant methods and procedures at the FCSD
24  preceding Dec. 29, 1999.  Sheriff Pierce was informed that the
25  training of command officers included search and seizure training
26  for FCSD deputies.  There is no evidence of any other cases or
27  events that would have provided Sheriff Pierce with notice or any
28  indication that search and seizure procedures at the FCSD were

1  inadequate or that training was deficient.  The motion for

2  summary adjudication is GRANTED as to Sheriff Pierce for the

3  alleged failure to train.

4

5                    V.   Conclusion

6      For all the reasons stated above, Defendant Sheriff Pierce's

7  motion for summary adjudication is granted and denied as follows:

8      1. GRANTED as to the official capacity claims.

9      2. DENIED, as to the individual capacity retaliation claim

10  for allegedly instituting the search and seizure without probable

11  cause in violation of the First, Fourth, and Fourteenth

12  Amendments.

13     3. GRANTED, as to the individual capacity for all failure to

14  have adequate search and seizure policies and failure to train

15  claims.

16     Defendant shall lodge a form of partial judgment consistent

17  with this decision within five (5) days following date of service

18  by the clerk.

19

20  DATED:  August 19, 2004.

21

22                          _____

23                               Oliver W. Wanger
                            UNITED STATES DISTRICT JUDGE

24

25

26

27

28

                              30

```
                    United States District Court
                            for the
                  Eastern District of California
                         August 20, 2004


            * * CERTIFICATE OF SERVICE * *


                             1:00-cv-07173


    Golden

        v.

    Fresno County
```

---

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Eastern District of California.

That on  August 20, 2004, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office, or, pursuant to prior authorization by counsel, via facsimile.

```
        M Jeffery Kallis                          OWW/gl
        The Law Firm of Kallis and Associates
        80 North First Street
        San Jose, CA  95113

        James J Arendt
        The Law Firm of Weakley Ratliff Arendt and McGuire LLP
        1630 East Shaw Avenue
        Suite 176
        Fresno, CA  93710

        James Darvin Weakley
        The Law Firm of Weakley Ratliff Arendt and McGuire LLP
        1630 East Shaw Avenue
        Suite 176
        Fresno, CA  93710

        Harvie Ruth Schreiber
        City of Fresno
        2600 Fresno Street
        Fresno, CA  93721-3602
```

By /s/ A Lopez